***********
The Full Commission has reviewed the prior Opinion and Award based upon the record of the proceedings before former Deputy Commissioner Young and the briefs and oral arguments before the Full Commission. The appealing party has not shown good ground to reconsider the evidence; receive further evidence; rehear the parties or their representatives; or amend the Opinion and Award, except for minor modifications. Accordingly, the Full Commission affirms the Opinion and Award of Deputy Commissioner Young, with modifications.
 ***********
The Full Commission finds as fact and concludes as matters of law the following, which were entered by the parties as:
 STIPULATIONS
1. The parties are subject to and bound by the provisions of the North Carolina Workers' Compensation Act.
2. An employment relationship existed between plaintiff and defendant at all relevant times herein.
3. Defendant was self insured.
4. Plaintiff was employed by defendant at its facility in Plymouth, North Carolina, from April 16, 1968, until his retirement on January 31, 2000.
5. The parties stipulated that plaintiff was last injuriously exposed to asbestos during plaintiff's employment with defendant, and specifically, that plaintiff was exposed to asbestos for thirty days within a seven-month period, as set forth in N.C. Gen. Stat. § 97-57.
6. The parties stipulated that defendant manufactures paper and paper products, including paper for crafts, bags, boxes, and pulp for baby diapers. The approximate size of defendant's plant in Plymouth, North Carolina, is 3/4 of a mile long. The entire facility is built on approximately 350 acres and encompasses about 20 different buildings. The newest building was built in the 1960s and the vast majority of the insulation used in the original construction of the buildings contained asbestos. Steam-producing boilers are used at the facility, along with hundreds of miles of steam pipes covered with asbestos insulation. The heat coming off the steam pipes is used, among other things, to dry the wet pulp/paper.
7. The parties stipulated that plaintiff's income for the fifty-two (52) weeks prior to his date of last employment was $49,127.00, which is sufficient to justify the maximum rate allowable under the North Carolina Workers Compensation Act. The parties further stipulated that plaintiff's date of diagnosis was April 28, 2000.
8. The parties agree that on the date plaintiff was diagnosed with asbestosis, he was not employed.
9. The Pre-Trial Agreement of the parties for this case is stipulated into evidence.
10. The employment and income records of plaintiff have been stipulated into evidence.
11. The transcript of Joseph Wendlick's testimony at civil trial, his curriculum vitae, and other documentation produced by defendant during discovery has been stipulated into evidence.
12. The relevant medical records of plaintiff, including documentation from Drs. Garland, Curseen, Bernstein, Dula, Lucas, and Weaver have been stipulated into evidence.
13. Defendant stipulates that all of the procedures used in defendant's asbestos medical surveillance program at its Plymouth facility were consistent with those outlined as part of the North Carolina Dusty Trades Program, which is contained in N.C. Gen. Stat. §§ 97-60 through 97-61.7. Further, these procedures were in place during plaintiff's employment at the Plymouth facility.
14. Defendant stipulates that the medical monitoring procedures used in its asbestos medical surveillance program in all Weyerhaeuser plants in the State of North Carolina were the same.
15. Defendant stipulates that the Weyerhaeuser facilities to which Mr. Joseph Wendlick referred to in his deposition transcript stipulated into evidence included the facilities in North Carolina.
16. Plaintiff contends that he is entitled to an award of a 10% penalty pursuant to the provisions of N.C. Gen. Stat. § 97-12, and defendant stipulated that should the claim be found compensable, defendant would agree by compromise to pay an amount of 5% of all compensation, exclusive of medical compensation, as an award of penalty pursuant thereto.
17. The parties contend that the contested issues before the Industrial Commission are:
 (a) Does plaintiff suffer from a compensable asbestos-related occupational disease and/or diseases? If so, what disease and/or diseases?
 (b) Does plaintiff suffer from any medical condition, which has been aggravated, accelerated and/or contributed to as a result of his asbestos-related disease(s)?
 (c) What benefits, monetary and/or medical, is plaintiff entitled to receive, if any, at this time?
 (d) Is plaintiff entitled to the additional panel examinations as provided in N.C. Gen. Stat. § 97-61.3 et seq., to determine what, if any, final compensation he may be due?
 (e) Does N.C. Gen. Stat. §§ 97-60 through 97-61.7 apply to plaintiff's claim for benefits, and regardless, are these statutes in violation of the Constitutions of the United States and North Carolina?
 (f) Is plaintiff engaged in an occupation that has been found by the Industrial Commission to expose employees to the hazards of asbestosis under the provisions of N.C. Gen. Stat. §§ 97-60
through 97-61.7?
 (g) At the time of diagnosis, was plaintiff subject to removal from an occupation that exposed plaintiff to the hazards of asbestosis, as contemplated by N.C. Gen. Stat. §§ 97-60 through 97-61.7?
 (h) Whether plaintiff is entitled to attorney fees for the unreasonable defense of this matter?
 ***********
Based upon all of the competent evidence of record and reasonable inferences flowing therefrom, the Full Commission makes the following:
 FINDINGS OF FACT
1. Plaintiff was an employee of defendant at its Plymouth, North Carolina, facility from April 16, 1968, until January 31, 2000.
2. Plaintiff was exposed to asbestos dust while employed at defendant's facility from a variety of sources. Plaintiff worked in the plywood department close to the dryer, which was insulted with asbestos. Additionally, plaintiff worked in the lime kiln area where there were boilers and steam pipes covered in asbestos. Whenever the steam was turned on, the boilers and pipes would tremble causing pieces of insulation to fall from the pipes. Plaintiff would clean up the debris with a broom and air hose, which created "foggy like conditions." In 1974, plaintiff was transferred to the recovery boiler area where his job duties included "punching" spouts in the boilers. Plaintiff would use a long pipe or air hose to unclog the holes in the boilers, which were wrapped in asbestos. The boilers would vibrate and create a great deal of asbestos dust in the air. There was no special ventilation in the recovery boiler area to remove the asbestos dust from the air. Plaintiff later became a machine operator on the paper machines. The paper machines had asbestos-containing brake shoes that plaintiff would change when they wore down. As they wore, the debris from the asbestos brake shoes would be released into the air. Plaintiff was also occasionally exposed to asbestos in the fine paper department. In his work area, there were still visible parts of overhead insulated pipes that were not covered with aluminum. Defendant did not provide plaintiff with any respiratory protection to protect him against asbestos exposure.
3. Plaintiff was exposed to asbestos-containing materials on a regular basis for more than 30 working days or parts thereof inside of seven consecutive months from 1968 to 2000.
4. Dr. Jeffrey Garland performed plaintiff's Advisory Medical Evaluation at East Carolina University on October 26, 2000. During his deposition on June 1, 2001, Dr. Garland opined to a reasonable degree of medical certainty that plaintiff has asbestosis and diaphragmatic pleural plaque, which is consistent with asbestosis. Dr. Garland based his opinion on plaintiff's significant history of asbestos exposure, his adequate latency period, his shortness of breath, and his CT scan and chest x-ray reports showing interstitial and pleural abnormalities. Dr. Garland testified that he gave great weight to the testimony and chest film report of Dr. Weaver, whom he regards as a highly trained B-reader and radiologist experienced in diagnosing asbestosis on chest film.
5. Dr. Richard Bernstein diagnosed plaintiff with asbestosis on April 28, 2000. Dr. Bernstein's diagnosis was based upon plaintiff's long history of asbestos exposure and latency period, his x-ray findings, his moderate to severe dyspnea on exertion and his pulmonary function testing and severe hypoxia. Dr. Bernstein personally examined plaintiff's chest x-ray dated April 1, 2000, and found parenchymal abnormalities in the middle and lower lung zones consistent with asbestosis. Dr. Bernstein was unable to finish performing pulmonary function testing on plaintiff because plaintiff's hypoxia was so severe that he had to be immediately sent to the hospital and admitted to the ICU. Dr. Bernstein confirmed these findings in his deposition on April 9, 2001.
6. Dr. Albert Curseen saw plaintiff in the emergency room at Martin General Hospital on April 29, 2000, and treated him for his severe shortness of breath and hypoxia. In a follow up office visit on November 6, 2000, Dr. Curseen diagnosed plaintiff with asbestosis. Dr. Curseen's diagnosis was based upon plaintiff's strong history of asbestos exposure and adequate latency period, his chest radiographs, clubbing of the fingernails, bibasilar rales, and history of dyspnea on exertion. Dr. Curseen confirmed these findings during his deposition on March 22, 2001.
7. Dr. Michael Weaver, a certified B-reader at East Carolina University, interpreted a chest x-ray dated April 1, 2000, and determined that there were parenchymal and pleural abnormalities on both sides consistent with pneumoconiosis. During his live deposition on April 6, 2001, Dr. Weaver testified that these abnormalities would be consistent with asbestosis assuming appropriate exposure history and latency period.
8. Dr. Phillip Lucas, a certified B-reader, interpreted a high resolution CT scan dated July 26, 2000 and determined that there were interstitial changes consistent with asbestosis in a patient who has had an adequate exposure history and latency period. Dr. Lucas confirmed these radiographic findings during his live deposition on April 10, 2000.
9. Dr. Fred Dula, a certified B-reader, interpreted plaintiff's CT scan and chest x-rays dated December 28, 2000. On his report, Dr. Dula determined that there were parenchymal changes and diaphragmatic plaques present, which would be consistent with asbestosis. During his deposition on April 24, 2001, Dr. Dula confirmed that these radiographic findings are consistent with asbestosis.
10. Defendant failed to produce any conflicting medical evidence to refute these findings.
11. Plaintiff developed asbestosis, an occupational disease, as a result of his employment with defendant.
12. Plaintiff's employment with defendant placed him at an increased risk of developing asbestosis as compared to members of the general public.
13. Plaintiff began having shortness of breath problems for a few years before leaving his job on January 31, 2000. At the hearing, plaintiff testified that he had problems doing the walking and labor necessary to perform his job as a cutter in the fine paper department. He had problems loading rolls and peeling the paper rolls as quickly as required by his job duties. His co-workers, including Thurliss Jackson, testified at the prior hearing that he noticed plaintiff was having problems and would try to assist him and "get his back," but plaintiff became too slow for the "rat race line." Plaintiff's supervisor caught him working too slowly and told him it was unsafe. Plaintiff had to stop working before the age of sixty-five (65) because of his progressive shortness of breath and weakness due to his compensable asbestosis.
14. Plaintiff has only an 11th grade education. He worked for defendant for over 31 years and was making over $49,000.00 a year when he had to retire early. Plaintiff did not actively seek employment after he retired in 2000 because of his increasingly severe shortness of breath, his oxygen dependence, his age, and the lack of comparable employment opportunities in the rural area in which he lives.
15. Plaintiff's breathing has continued to decline since he has left the employment of defendant. When he went to see Dr. Bernstein for his shortness of breath, he could not complete the pulmonary function testing and had to be transported to the hospital for acute respiratory failure. Plaintiff currently wears oxygen most of the time, including during the night while he sleeps. He cannot walk much and cannot participate in any of his prior hobbies including hunting, fishing, and gardening.
16. When plaintiff was evaluated by Dr. Garland on October 16, 2000, Dr. Garland prescribed oxygen for plaintiff and instructed him that he must wear an oxygen mask 24 hours a day. Dr. Garland testified that plaintiff's dypsnea, shortness of breath, and need for oxygen was contributed to by his asbestosis and his COPD. Further, Dr. Garland testified that plaintiff is an AMA Class IV impaired individual and that his underlying disease process of asbestosis could accelerate the debilitation associated with his co-existing emphysema. Overall, Dr. Garland opined that when you have two co-existing lung diseases such as asbestosis and COPD, it is extremely difficult to determine the degree to which each of these diseases contributes to the overall impairment.
17. Dr. Curseen testified that plaintiff is at a Class IV level of respiratory impairment by AMA guidelines. He also testified that plaintiff would be unable to perform any kind of physical or manual work with this impairment and it would be unadvisable for him to work anywhere since he is oxygen dependent. Further, Dr. Curseen testified that there is no way to distinguish out how much of plaintiff's impairment is due to his asbestosis and how much is due to his smoking.
18. Dr. Bernstein also testified that plaintiff would be unable to perform any type of physical work with his level of impairment. Additionally, he testified that plaintiff would have difficulty even with tasks of daily living due to his impairment. It is also the opinion of Dr. Bernstein that plaintiff's asbestosis is a contributing factor to his impairment.
19. Plaintiff is incapable, due to his breathing impairment from his asbestosis, of earning the same wages he earned before his injury in the same or any comparable occupation.
20. Plaintiff's incapacity to earn is caused by the occupational disease of asbestosis. and plaintiff is totally and permanently disabled and has been so since January 31, 2000.
21. Plaintiff's pulmonary impairment is permanent and is likely to progress. Plaintiff would benefit from medical monitoring, evaluation, and some treatment in the future as a result of his asbestosis and asbestos-related pleural disease. Further, medical monitoring is reasonably necessary due to his increased risk of developing lung and other asbestos-related cancers.
22. Defendant's Plymouth facility was found to have high levels of friable asbestos dust by their own Industrial Hygienist, Joseph Wendlick. As a result of Mr. Wendlicks findings, an asbestos medical monitoring program was initiated to comply with the provisions of N.C. Gen. Stat. §§ 97-60 through 97-61.7.
23. Plaintiff's income for the fifty-two (52) weeks prior to his retirement in 2000 was $49,127.00, which is sufficient to produce the maximum weekly compensation rate for 2000, $588.00. Plaintiff has not returned to work in any capacity for defendant or any other employer.
24. The lung is an important organ, and plaintiff has sustained permanent damage to both his left and right lung as a result of his exposure to asbestos while working for defendant.
 ***********
Based upon the foregoing stipulations and findings of fact, the Full Commission reaches the following:
 CONCLUSIONS OF LAW
1. Prior to his retirement, plaintiff contracted the occupational diseases of asbestosis and asbestos-related pleural disease as a result of his employment with defendant. N.C. Gen. Stat. §§ 97-53(24) and97-62.
2. Plaintiff was last injuriously exposed to the hazards of asbestos dust while employed by defendant, and for as much as 30 days or parts thereof, within seven consecutive months, which exposure proximately augmented his asbestosis. N.C. Gen. Stat. § 97-57; Clark v. ITTGrinnell Industrial Piping, Inc., 141 N.C. App. 417, 539 S.E.2d 369
(2000); Haynes v. Feldspar Producing Co., 222 N.C. 163, 22 S.E.2d 275
(1942); Barber v. Babcock Wilcox Construction Company,101 N.C. App. 564, 400 S.E.2d 735 (1991).
3. It has been determined that a retiree who is no longer employed by the asbestos-exposing industry is not entitled to an order of removal and the subsequent award because he no longer faces the possibility of exposure. See Austin v. General Tire, 354 N.C. 344, 553 S.E.2d 680
(2001).
4. Having contracted asbestosis, plaintiff would be entitled to recover weekly compensation at the rate of $588.00, the rate at the time of diagnosis, for each week that he is unable to earn wages by reason of his occupational disease. This is based upon plaintiff's showing of total incapacity due to his breathing problems and weakness associated with asbestosis, an occupational disease. N.C. Gen. Stat. §§ 97-61.6 and97-29.
5. Additionally, plaintiff is entitled to compensation in the amount of $20,000.00 for the permanent injury to each lung, due to his occupational disease of asbestosis. N.C. Gen. Stat. § 97-31(24).
6. Plaintiff is entitled to have defendant pay for such medical expenses incurred or to be incurred as a result of plaintiff's asbestos-related pleural disease and asbestosis as may be required to monitor, provide relief, effect a cure, or lessen plaintiff's period of disability. N.C. Gen. Stat. §§ 97-25, and 97-59.
7. Plaintiff is entitled to undergo subsequent examinations as provided by law, pursuant to the provisions of N.C. Gen. Stat. §§ 97-61.1, etseq., and is further entitled to any additional benefits due to plaintiff, which shall be determined after additional examinations and hearings.
8. Defendant stipulated that, should the Industrial Commission determine that plaintiff contracted the occupational disease asbestosis during the course and scope of his employment with defendant, defendant would waive further proof needed under N.C. Gen. Stat. § 97-12 (that the injury is caused by the willful failure of the employer to comply with any statutory requirement) and, in compromise of this issue, would accept a 5% penalty against all compensation due other than medical compensation. The Industrial Commission has so determined and defendant's offer of a compromise 5% penalty is deemed appropriate.
9. The issue of the constitutionality of N.G. Gen. Stat. §§ 97-60 etseq., has been raised by defendant and ruled upon by the North Carolina Court of Appeals. In Jones v. Weyerhaeuser Co., 141 N.C. App. 482,539 S.E.2d 380 (2000), disc. review denied, 353 N.C. 525, 549 S.E.2d 858
(2001), and in Clark v. ITT Grinnell Industrial Piping, Inc.,141 N.C. App. 417, 539 S.E.2d 369 (2000), the Court ruled unanimously that the provisions of N.C. Gen. Stat. § 97-61.5 are constitutional.
 ***********
Based upon the foregoing findings of fact and conclusions of law, the undersigned enters the following:
 AWARD
1. Defendant shall pay to plaintiff compensation for total incapacity as a result of his contraction of asbestosis, and asbestos-related pleural disease while employed by defendant, at a weekly rate of $588.00, commencing on January 31, 2000, the date of his retirement due to breathing difficulties and weakness associated with asbestosis, and continuing for the remainder of plaintiff's life. The amount that has accrued to the date of this opinion and award shall be paid in a lump sum, subject to attorney's fees approved herein. Thereafter, defendant shall pay $588.00 per week to the plaintiff with every fourth check payable directly to plaintiff's counsel.
2. Subject to attorney's fees hereafter provided, defendants shall pay to plaintiff $20,000.00 for the permanent injury of an important organ, his right lung, and $20,000.00 for the permanent injury of his left lung, both injuries caused by asbestosis and asbestos-related pleural disease. Compensation due that has accrued shall be paid in a lump sum, subject to the attorney's fees hereinafter provided.
3. Defendant shall pay an additional sum of 5% of the compensation awarded in paragraph 1 above to plaintiff, which shall also be paid in a lump sum. As per agreement of the parties, defendant shall also pay a 10% late penalty pursuant to N.C. Gen. Stat. § 97-18.
4. Defendant additionally shall pay interest in the amount of 8% per annum on this award from the date of the initial hearing on this claim, February 19, 2001, until paid in full. The interest shall be paid in full to the claimant and is not subject to attorneys' fees. N.C. Gen. Stat. § 97-86.2.
5. Defendant shall pay all medical expenses incurred or to be incurred when bills for the same have been approved, in accordance with the provisions of the Act.
6. Plaintiff shall undergo additional examinations as provided by law.
7. A reasonable attorney's fee of 25% of the compensation due plaintiff as was awarded in paragraphs 1 and 2 above is approved for plaintiff's counsel. Defendant shall deduct 25% of the lump sum otherwise due plaintiff shall pay such 25% directly to plaintiff's counsel.
8. Defendant shall pay the costs of this proceeding.
 ***********
This 18th day of October, 2002.
 S/_____________ THOMAS J. BOLCH COMMISSIONER
CONCURRING:
 S/___________________ BERNADINE S. BALLANCE COMMISSIONER
CONCURRING IN PART AND DISSENTING IN PART:
 S/_______________ DIANNE C. SELLERS COMMISSIONER